IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

United States of America

    v.                                  Docket No. 7:21-CR-11 (EKD)

Melvin Childress

**Defendant's Motion to Reconsider Court's Order Denying Defendant's Motion to Compel Discovery**

On June 23, the defense requested that the government provide it, pursuant to Rule 16(a)(1)(E), the Virginia state police policy regulating how police are supposed to interact with confidential informants and conduct controlled purchases. The government did not respond in any way to that request. The government asked the defense the day prior to the pre-trial conference if there was anything to be discussed. The defense again brought up the discovery request, and the government did not respond.

At Mr. Childress's pretrial conference, the defense moved orally for the government to produce the requested discovery. The government responded that the requested discovery would not be admissible and was thus not discoverable. However, the defense correctly rebutted that discovery is not limited to admissible evidence. The defense indicated it would file a pleading with respect to this issue, but the court instructed the defense not to do so. Because the court denied the defense's motion and requested the defense abstain from making a complete record and argument, the defense now moves the court to reconsider its ruling.

The Virginia State Police policy relating to confidential informants and controlled purchases is material to the defense. It is also likely exculpatory, as the state police investigating this case appear to have acted contrary to established norms related to controlled purchases.

**Several aspects of the controlled purchases at issue demonstrate that the police acted inconsistent with standard procedures that govern how police should conduct controlled purchases.**

First, this is not a case where a sworn law enforcement officers personally received drugs from a suspect. This is not a case where sworn law enforcement officers observed the suspect sell drugs. And this is not a case where any drug sale was captured on camera. Instead, this is a case where police negligence led to a dearth of information to corroborate the word of a confidential informant who had a substantial motivation to set up Mr. Childress.

Normally, when police engage in controlled purchases where an informant is purchasing drugs (as opposed to an undercover officer), they impose several procedures to help "control" or protect the integrity of the investigation. These controls help to account for the inherent unreliability of informants and correct for police's minimal involvement in the investigation. *See*, *e.g.*, *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997) (finding that informants are "[b]y definition . . . cut from untrustworthy cloth[,] and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crim, and from lying under oath in the courtroom . . .").

Typical controls include videotaping the investigation to capture the alleged sale, searching the informant before and after the purchase, comparing the type and weight of the drugs received from the informant with the type and weight allegedly purchased, reviewing videotape to correct any deficiencies for future controlled purchases, preventing the informant from controlling or deciding how, where, or what drugs to purchase. The government's case agent testified to some of these controls during a bail hearing in this case:

```
Q    And -- okay.  And were all the -- when you say -- when we
talk about a controlled buy, what kind of controls were in
place?
A    All the standard controls:  The informant was searched
before and after the deal; any vehicles that may have been
utilized were searched before and after the deal; everything
that was done was under the direction of the case agent; and
then the audio/video being monitored and recorded during the
deal.
```

Here, while police claim to have searched the suspect and his vehicle, no videotape exists of those searches. And though the informant wore a hidden camera during each of the purchases, the camera captured little information. The first purchase resulted in no video being captured. The second, third, and fourth purchases resulted in the informant simply capturing the defendant's torso, but no transaction, money, or drugs were observed. None of the arrangements for the purchases captured any audio detailing prices or descriptions of what the informant claims to have purchased (such as slang words for drugs, like "down," "D," "dope," "smack," "H," "white," or any other terms). And in the first buy, the informant altered the amount of alleged drugs he claims to have purchased from the informant and the location for the sale to occur. The agents had arranged for the informant to buy one gram at Mr. Childress's house. Instead, the informant allegedly arranged to purchase one and a half grams at a water tower down the street from Mr. Childress's home. And the informant changed the debrief location and asked investigators to meet him at a different place than previously arranged after the alleged purchase concluded.

Most significantly, none of the controlled purchases resulted in the informant providing the police with drugs that matched the amount of drugs he claimed to have purchased from Mr. Childress. Each time, the informant provided a different amount of drugs than he claimed to have bought. The discrepancies range from 10% fewer drugs than allegedly purchased to 200% more drugs than allegedly purchased. And none of the government's witnesses appears to have noticed or thought to investigate these discrepancies. The case agent testified as such at Mr. Childress's bond hearing:

```
Q    We'll go to the fourth buy.  We're almost done, Officer.
     The fourth buy was for 2 grams, correct?  You might not
know, but --
A    Yeah.
Q    Do you know if it was for 2 grams?
A    I don't have it memorized.  I'm sorry.
Q    Were you aware of the fact that in the fourth buy what was
recovered from the confidential informant wasn't 2 grams, but
was, in fact, 3 grams?
A    Again, I don't have each detail of each controlled
purchase memorized.
Q    Did you make note of the fact -- did any officer make note
of the fact, or did the government make note of the fact that
in none of the controlled buys was the amount of heroin
received or fentanyl received consistent with the amount that
was arranged to have been purchased allegedly from my client?
A    I'm not aware of any discrepancies with the money and the
amount of narcotics being supplied.
```

These are some of the many reasons inherent to the government's case that demonstrate any policy or procedure on controlled purchases is likely to contain exculpatory information and information material to the defense.[1]

**The cases the court cites are inapposite to the current circumstances.**

In *United States v. Sandalo*, the defendant requested discovery of police policies related to working with confidential informants. 3:19-CR-295 (VLB), 2020 WL 1815862 (D. Conn. Apr. 10, 2020) The request was made prior to and related to the defendant's motion to suppress. The court denied the motion and also misstated the law, finding that documents are "discoverable if they are material to the defense *and* the government intends to use them in its case in chief." *Id.* at *4. In fact, information is discoverable under Rule 16(a)(1)(E) if it is material to the defense *or* the government intends to use them in its case in chief *or* if the item was obtained from or belongs to the defendant.

Further, the defense requested those documents to help him convince the court to suppress the evidence, as the defense stated in its motion to compel, that the "search warrant affidavit is the lynchpin of this case." ECF No. 54 at 5. The defense in that case found it odd that the government waited to arrest the defendant for years, and surmised that, "if law enforcement believed those alleged controlled buys . . . were properly conducted, they would have arrested the defendant" years earlier. ECF No. 54 at 6. Finally, the defense believed that the requested materials would show "how egregious the law enforcement's mistakes were and how poorly their investigation was concluded, both of

---

[1] The defense has more information and evidence demonstrating the police activity was sloppy and that the informant is unreliable. However, the defense cannot be required to reveal that information just so it can obtain adequate discovery from the government. The information provided shows that the defense is not going on a fishing expedition, but has specific facts and inferences drawn from those facts that demonstrate the requested information is material to the defense.

which diminishe[d] the evidentiary value . . . especially in terms of the validity of the search warrant." ECF No. 54 at 18.

The court, in denying the defendant's motion, did not find that the requested items were relevant to a defense or to the defendant's motion to suppress. And the defense stated that the only relevant defense it had was to suppress the evidence police obtained, not that they had a factual defense to the charges. Because the defense did not provide any relevant reason that it needed the documents, the court correctly denied the defendant's request.

Unlike in that case, Mr. Childress has specifically identified numerous instances of police negligence and described how that negligence helps to establish his defense: that he did not sell fentanyl to the informant. Further, Mr. Childress is requesting that information because it is necessary for him to impeach the government's witnesses at trial, not simply to fish for a reason to attempt to suppress evidence. Finally, Mr. Childress is not speculating, as Mr. Sandalo did, that the requested information will help to show that the police did not believe they had sufficient evidence after prior controlled buys. Instead, the information will help Mr. Childress to demonstrate that the investigation was shoddy, and controls typically placed to prevent informants from setting up an innocent man were not in place or not adhered to in this case.

In *United States v. Ward*, the defendant moved to compel the production of procedures police follow when dealing with confidential informants, similar to Mr. Childress's case. 4:19-CR-101 (DCN), 2021 WL 788825 (D. Idaho Feb. 25, 2021). However, unlike in this case, the defendant did not present any "specific facts or evidence that would call the integrity of the investigation into question." *Id.* at *4. The defendant did not "identify any facts to suggest the integrity of the investigation was compromised or that appropriate procedures were not followed." *Id.* at *5. As such, the court found that his

"conclusory allegation" without "grounding in the facts" was "insufficient to establish the materiality of the broad scope of policies and standard operating procedures he seeks." *Id.*

Unlike in that case, Mr. Childress has specified several problematic parts of the police operation. He has specifically identified where the police "controls" were inadequate and identified why the absence of those controls has led to an inadequate investigation. The two cases could not present more dissimilarly despite the two defendant's presenting similar requests.

In *United States v. Monell*, the defendant sought similar policies and argued that they were relevant to a *Franks* hearing. CR-12-10187 (FDS), 2013 WL 12437912 (D. Mass Feb. 25, 2013). The court correctly denied the motion. Mr. Childress has not requested this information relevant to any motion to suppress, but rather with respect to his trial. And, unlike in Monell, Mr. Childress has specified why the information is material and how it would be relevant to his defense. The information is essential to Mr. Childress's ability to impeach the government's witnesses, and Mr. Childress has specifically proffered how the information is relevant.

Finally, the court cited to *United States v. Burton*, where a defendant moved for, among other items, discovery of the FBI's policies related to working with confidential informants. 81 F. Supp. 3d 1229 (D N.M. 2015). The defendant hoped that the policies would show that an FBI agent had improperly neglected to record all of his conversations with the informant, that the policy might show that, as an informant, one of the defendants was permitted to sell fake drugs, and that an informant would not likely conspire to sell fake drugs via a telephone if he knew that the FBI would record an informant's calls. However, the defendant offered no evidence to support his conjectures. Instead, he merely engaged in "speculation" and "mere hopeful wishing" *Id.* at 1256.

Again, unlike in Burton, Mr. Childress has presented specific arguments detailing significant deficiencies in the police investigation and argued how those deficiencies help to demonstrate that he did not sell fentanyl to the government's informant. Mr. Childress has not speculated about anything or engaged in any hopeful wishing. Instead, he has indicated that the investigation was sloppy, that officers were negligent, and that the controlled buys in this investigation failed to adequately corroborate the informant's claim that he obtained fentanyl from Mr. Childress.

**The court misapprehended the law by failing to consider how the requested information would help the defendant to impeach the government's witnesses.**
The defendant does not have a heavy burden to show materiality. If the defendant can show that there is a "strong indication that [the information requested] will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal," then the evidence is material. *See United States v. Caro* 597 F.3d 608, 622 (4th Cir.2010) (citing *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) In *Caro*, the defendant requested information from the government and speculated that the information it requested would help the defendant's expert show that Caro was not dangerous. *Id.* at 622. However, the defendant did not present any facts to help show that the information would have favored the defendant, as opposed to the government. *See id.* As such, the court correctly denied the defendant's request.

Unlike in Caro, information detailing how the Virginia State Police are supposed to conduct controlled purchase or recruit confidential informants will help Mr. Childress. Mr. Childress has identified a number of instances of sloppy police work in this case that demonstrate the police did not adequately control the investigation to account for the informant's inherent unreliability. To the extent that these inadequacies are documented in a Virginia State Police policy, or the DEA policy to the extent that TFO Agent Shilling was

involved during the controlled purchases (which the court declined to address), the information is clearly material to the defense's ability to impeach the officers.

The Fourth Circuit has clearly established that the defense may inquire into whether officers followed police policy on relevant issues. *See, e.g., United States v. Smith*, 451 F.3d 209, 221 -222 (4th Cir. 2006). In *Smith*, the Fourth Circuit found the District Court abused its discretion in limiting the defense's ability to question an officer about the police policy regarding destruction of evidence. In that case, an officer testified that police destroyed the evidence pursuant to police policy after the state charges against the defendant were dismissed. However, it was clear that the state charges were dismissed only after the case was taken over by the federal government and brought in federal court. *See id.* at 220 The court nonetheless precluded the defense from questioning the witnesses about this policy and the destruction of the drugs. *Id.*

The Fourth Circuit found that limitation unconstitutionally prevented the defense from inquiring into legitimate areas on cross examination. Notably, the court made that holding even after finding that the defense had no legal ground to suppress evidence after it had been destroyed. *See id.* at 221. Instead, the inquiry into the destruction of the evidence was directly related to witness credibility, "trustworthiness[,] and competence" "and was "crucial to the jury's assessment of the prosecution's case." *See id.* An officer testified that he destroyed the evidence, pursuant to policy, only after the state case was dismissed, and that the officer had no knowledge of the federal prosecution. But the state prosecution was dismissed solely because the cases were taken up by the federal government. As such, testimony on this issue was directly relevant to the officer's credibility.

Similarly, the officers here employed a number of "controls" to help limit the informant's ability to taint the investigation. The most basic controls, telling the informant how much drugs to purchase, where to buy them, and where to meet after the alleged buy,

were not employed in the first buy. Other basic controls were not employed: the hidden camera did not capture any video on the first buy, and did not capture any transaction, drugs, or money on the next three. The informant never asked to purchase drugs or specified what he claimed to be purchasing. The police never questioned the informant about the discrepancy between the amount of drugs purchased and those received from the informant. Police utilized an informant who used some of the drugs received during the operation and never questioned him about his use of evidence. And that informant had continued to purchase drugs for himself, in violation of his agreement with the state police, after signing up to be an informant. The informant also told his brother about his cooperation with the police and claims to have been purchases thousands of dollars a month worth of drugs despite having no apparent ability to afford such a habit.

To the extent that police have a policy on working with informants and conducting controlled buys, that policy is clearly relevant for inquiry on cross examination. Because it is likely to contain impeachment information and to aid in the impeachment of officers, it is clearly material to the defense. And because it is within the possession of the prosecution, who decided to take a Virginia State Police case of four small sales of fentanyl, the information is discoverable under Rule 16.

## Conclusion

The law is clear that defendants do not have a heavy burden to demonstrate materiality when requesting information under Rule 16(a)(1)(E). If the defense can present a reason why the information would be relevant to an issue at trial, to uncovering evidence, or to impeaching a witness, the evidence is admissible. Here, the requested policy is directly relevant to the officers' conduct at trial and is provides information that will be used to impeach the officers and their investigation. It is clearly material, potentially exculpatory, and the court should order the government to produce it to the defense.

Respectfully submitted,
By: /s/ Benjamin M. Schiffelbein

Benjamin M. Schiffelbein, Esquire
Asst. Federal Public Defender
NH Bar No. 267593
210 First Street SW, Room 400
Roanoke, Virginia 24011
Ph. (540) 777-0880
Fax (540) 777-0890
Benjamin_Schiffelbein@fd.org


Respectfully Submitted,
/s/Monica D. Cliatt

MONICA D. CLIATT, Esquire
First Asst. Fed. Public Defender
PA Bar No. 84848
210 First Street SW, Suite 400
Roanoke, VA 24011
Tel: (540) 777-0880
Email: monica_cliatt@fd.org

**Certificate of Service**
I certify that I filed this motion through the court's CM/ECF system on July 12, 2021.


/s/ Benjamin Schiffelbein